Geller, J.
This is an action for a declaratory judgment brought by Fulway Corporation (hereinafter referred to as “ plaintiff ” or “ landlord ”), landlord of the property situated at 204-8 Broadway, located at the southeast corner of Broadway & Fulton Street, Manhattan, against Liggett Drug Company, Inc. (hereinafter called “ Liggett ”), and Isaac Feinberg (hereinafter called “ Feinberg ”), both of whom are tenants in said building.
This action is brought to determine whether or not the construction and operation of a “ Burger Bowl ” eating establishment by Feinberg will violate a restrictive covenant contained in the lease between plaintiff and Liggett. Plaintiff asks that it be determined that the erection and operation of the Burger Bowl will not violate the restrictive covenant. Liggett, which has joined in the prayer for a declaratory judgment, seeks a judgment, declaring that the operation of such Burger Bowl eating establishment will violate the restrictive covenant, enjoining Feinberg from erecting and operating the said Burger Bowl and also enjoining plaintiff from allowing its construction and operation. Feinberg likewise joins in the prayer for a declaratory judgment, declaring that the erection and operation of the Burger Bowl does not violate the restrictive covenant.
Plaintiff, who was then and is now the landlord of the property, entered into a lease with Liggett on June 18, 1942, for a term which commenced November 13, 1942, and is to expire on April 29, 1961, for the corner store on the street floor of the property and part of the basement for use as indicated in the lease, as follows: ‘ ‘ Tenant shall use the demised premises only as and for a ‘ Liggett Drug Store ’ and for no other purpose, it being understood, however, that Tenant may handle such merchandise as now or hereafter sold or offered for sale in any other Liggett drug stores in New York City. ” The said lease also contained the following restrictive covenant: ‘ Landlord will not, during the term hereof, let, use or permit to be used any other portion of the building of which the demised premises form a part: (a) for the sale, display or advertising of drugs, medicines, medicinal rubber goods, hospital supplies, perfumes, toilet preparations and toilet articles; nor (h) for the operation of a soda fountain or soda fountain-luncheonette; nor (c) for *530 the operation of a milk bar, orange drink stand or frankfurter stand, whether or not of an open-type store front construction, and regardless of whether items other than milk, frankfurters or orange drink are sold at such bar or stand; nor (d) for the sale of cigars, cigarettes or tobacco, except as such cigars, cigarettes or tobacco are sold as an incidental line to the principal line of business of any other occupant of, the building.” (Emphasis added.) , Liggett entered into possession of ■ the demised premises and has,, since the inception of the lease, operated therein its' business of a drugstore, soda, fountain and .luncheonette.
.The aforesaid restrictive covenant was also embodied in an additional, separate short form lease executed by the landlord and Liggett, which was placed on record in the register’s office of the City of New York, New York County, on.July 2, 1942.
On June 6, 1952, plaintiff leased to Feinberg the store on Broadway, adjoining on the south the store occupied by Liggett, for a term commencing on November 1, 1952, and terminating April 29,1961. Said lease with Feinberg provided:. “ 2, Tenant shall use and. occupy demised premises for selling and dealing in.books, lending library, greeting cards, stationery, toys, novelties, gift items, etc., and for no other purposes.” Said Feinberg lease also contained the following rider: ■“ 37. And the Tenant for and on behalf of himself and each and every undertenant of the demised premises, or of any part thereof, hereby covenants and agrees, to and with the Landlord that the Tenant and said undertenants or occupants, or any of them, shall not nor will at any time manufacture, sell or expose for sale, at retail or otherwise, upon the demised premises, or any part thereof, any strong or spirituous or intoxicating liquors, wine, ale or beer or take or have a license for such manufacture or sale, except that permission is hereby given to maintain a bona fide restaurant in said building, the primary object of which is the sale of food, and for such purpose to have a license and sell wines, beers and liquors in connection therewith. ’’ (Emphasis added.)
In December, 1952, plaintiff and Feinberg entered into a modification agreement with respect.to said lease, which provided that ‘ ‘ the Tenant shall have the right to assign this lease or to sublet the premises herein demised or any part thereof, or for any purpose other than for the purposes prohibited by paragraph 37 hereof ”.
Upon Feinberg’s taking possession, he subdivided his store into two approximately equal size stores, one of which he sublet to another for the sale of lingerie, and one of which he *531 himself operated for the sale of greeting cards. In late July, 1955, he discontinued the operation of the greeting card shop, thereafter commenced the alteration of the interior of said premises into the Burger Bowl eating place, and subleased the said premises he had occupied to “ Burger Bowl Restaurant, Inc.”, a corporation wholly owned by him and his two sons, to whom he gave the stock they own. The said store is approximately eleven feet south of the Liggett premises.
Plaintiff and Feinberg claim, and the evidence shows, that the Burger Bowl eating establishment proposed to be erected will be similar in construction and character to the Burger Bowl eating place located at 44 West 34th Street in this city, which is operated by Feinberg.
Feinberg states that the operation of both Burger Bowls will be alike, except that at the new Burger Bowl at 204-8 Broadway there will be no soda fountain and that no soda fountain items, such as ice cream sodas, ice cream dishes, charged water, etc., will there be sold.
Plaintiff and Feinberg assert that inasmuch as the Liggett lease prohibits only “ a soda fountain or soda fountain-luncheonette ” and does not contain the word “ luncheonette ”, separately, the operation of a luncheonette without a soda fountain is permitted by the Liggett lease.
Feinberg further contends that even if a luncheonette without a soda fountain is forbidden by the Liggett lease, his establishment will be a restaurant and not a luncheonette.
Liggett contends that the words of the restrictive covenant in this lease “ nor (b) for the operation of a soda fountain or soda fountain-luncheonette-, nor (c) for the operation of a milk bar, orange drink stand or frankfurter stand ” (emphasis added), show a clear intention to prohibit the construction or operation of any food serving establishment other than a full scale restaurant.
Liggett further contends that the Burger Bowl will be a luncheonette, not a full scale restaurant, and is therefore prohibited by the aforesaid restrictive covenant.
The evidence shows that Liggett has been operating a large food and drinks department in its store at 204-8 Broadway ever since the store opened for business, at which there is sold food and meals, including meat and dairy products, for consumption at a counter and that the sales of said department for each of the years 1952-1955, inclusive, represented about 20% of the total annual business, of all character, transacted by Liggett in said store. The total sales at the said lunch counter for 1955 were about $90,000. The evidence further *532 shows that food items at the counter account for about 80% of the entire business of the food >and drinks department in said store, and that soda fountain items (e.g., ice cream products, sodas, etc.) account for the remaining business, about 20%.
The evidence also shows that the plan for the proposed Burger Bowl establishment provides only for counter service of forty patrons, and that substantially all of the same food items that Liggett serves at its counter will likewise be served at the Burger Bowl, excepting soda fountain items, such as ice cream sodas, ice cream dishes, etc., that food will be prepared and served from a service back-bar against the wall (as food is served at the Liggett counter) and also from cooking grills in the window, exposed to the customers.
Feinberg concedes that the recording of the short form lease above referred to, which embodied the restrictive covenant, gave him constructive notice of the restrictive covenant in the Liggett lease, when he entered into his lease (Stolts v. Tuska, 76 App. Div. 137; Lent & Graff Co. v. Satenstein, 210 App. Div. 251). Furthermore, the court finds that Feinberg was informed of the covenant in the Liggett lease at the time he negotiated and consummated his lease and that he was thereby given actual notice of the said restrictive covenant.
The two principal questions in this case are (1) does the said restrictive covenant forbid the erection and operation of a “luncheonette” which does not include a soda fountain?; and (2) if such luncheonette without soda fountain is forbidden, is Feinberg permitted to construct and operate his Burger Bowl on the grounds that it is a restaurant rather than a luncheonette ?
The crucial words of the restrictive covenant with which we are concerned are “ nor (b) for the operation of a soda fountain or soda fountain-luncheonette ”.
The prime issue and question, therefore, is: Does the failure of the restrictive covenant to include the word ‘ ‘ luncheonette ’ ’, separately, in and of itself, deprive Liggett of protection against competing luncheonettes in the building? This entails an interpretation of the restrictive covenant, particularly the words “ soda-fountain luncheonette ”.
The leading case of Bovin v. Galitzka (250 N. Y. 228, 232) states the rule as follows: “ The general rule for construing restrictive covenants or conditions contained in a lease is to so construe them as to carry out the intent of the parties.”
Where the meaning of a word or term in a restrictive covenant is uncertain, the courts will look to the surrounding circum *533 stances to ascertain the intention of the parties (Baumann & Co. v. Manwit Corp., 213 App. Div. 300; Reynolds v. Commerce Fire Ins. Co. of N. Y., 47 N. Y. 597, 605; Smith v. Smith, 277 App. Div. 694, 695).
The language in Baumann & Co. v. Manwit Corp. (supra, p. 302) is apposite: “ The primary rule for the interpretation of a covenant or other contract is ‘ to gather the intention of the parties from their words, by reading not simply a single clause of the agreement, but the entire context and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met.’ (Clark v. Devoe, 124 N. Y. 120.) ”
To determine the intention of plaintiff and Liggett, we must first examine the nature and meaning of the word “ luncheonette ”.
Parenthetically, research by the court indicates that the word “ luncheonette ” has been referred to and used in lawbooks only in recent years. The main volume of the publication “ Words and Phrases ” published by West Publishing Company in 1940, in common usage, had no reference to such word. It was not until the supplement to the main volume was thereafter published that there was any reference to the term V luncheonette ’ ’.
In Weiss v. Mayflower Doughnut Corp. (130 N .Y. S. 2d 264, 268, affd. without opinion 285 App. Div. 1031) a “luncheonette” is defined as follows: “ What is a luncheonette? The term ‘ luncheonette ’ has acquired a distinctive meaning in this community as a place where sandwiches, salads, quickly prepared hot food and non-alcoholic beverages are served. The word ‘ luncheonette ’ is a combination of the word ‘ luncheon ’ and diminutive suffix ‘ ette ’. The latter is borrowed from the French and when added to a word in English gives the meaning of ‘ like ’ or ‘ resembling ’ as in the word ‘ leatherette ’. * * * The luncheonette supplies a light meal or snack in contradistinction to a full meal supplied or furnished in a restaurant.” And, in speaking of a restaurant as distinguished from a luncheonette, the cited opinion continues and defines “ restaurant ” as follows (pp. 268-269): “ The plaintiff has a counter with 21 seats or stools; there are no tables, waiters or bus boys. In contrast, the defendant Mayflower will conduct a large restaurant, incident to no other business. * * * It will serve full course meals, specialties and a wide variety of meats. The customers will be seated by two hostesses and served by approximately 28 waitresses. There will be two kitchens with
*534 three or four chefs and between 6 and 8 helpers and 5 or 6 bus boys. * * * No food is prepared in front of a customer, nor is there any cooking apparatus visible to him.”
Webster’s New International Dictionary (2d ed.) defines luncheonette as “ A light lunch; also, a place where light lunches are sold ”, and defines lunch as “ A light meal, usually in the middle of the day ’ ’. See, also, Rialto Luncheonette v. 1481 Broadway Corp. (170 Misc. 754) where luncheonette is defined in substantially the same way.
Liggett is, and was at the time of the making of the lease, in the business of running a luncheonette, as an integral and important part of a “ Liggett Drug Store ”, which luncheonette, as a part thereof, includes soda fountain service. The intention of the restrictive covenant was and is to protect Liggett against competition from a similar business. Feinberg contends that by eliminating a soda fountain from his proposed establishment and agreeing not to serve those soda fountain items indicated above (which he claims is a small portion of total sales in his other Burger Bowl), he thereby avoids violating the covenant. To interpret the covenant in this narrow fashion and permit Feinberg to evade it so easily would ignore the intent of plaintiff and Liggett at the time of the making of their lease. The restrictive covenant with its prohibition of soda fountains, soda fountain-luncheonettes, milk bars, orange drink stands and frankfurter stands, was clearly designed to give broad protection and to prevent the operation of any type of food serving establishment, short of a full scale restaurant, whether or not the same includes soda fountain service.
The case of Larchmont Drug Store v. 4915 Realty Corp. (278 App. Div. 954, affd. 303 N. Y. 845) is most significant. In this case the landlord agreed not to rent any store in the building for a “ drug store, fountain, luncheonette ” (278 App. Div. 954). The defendant served fountain products, i.e., ice cream, sodas and carbonated drinks. However, he did not serve these products at a counter but only at tables and contended that he was not therefore operating a “ fountain ” (p. 955). In said case, as in the instant case, the defendant sought by a technical interpretation of the language to vitiate the expressed intention of a restrictive covenant. The court refused to be limited by this narrow approach and examined the intent of the parties, saying (p. 955): “ In order to give full effect to the words ‘ fountain ’ and. ‘ luncheonette ’ in the restraining clause of plaintiff’s lease, it must be held that the parties intended by the use of the word ‘ fountain ’ to restrain defendant landlord from renting any other store in the building for the sale, in *535 whole or in part, of fountain products, whether served at the fountain itself or at tables a few feet from the fountain.”
Peoples Trust Co. v. Schultz Novelty & Sporting Goods Co. (244 N. Y. 14); Topol v. Smoleroff Development Corp. (264 App. Div. 164); Val-Kill Co. v. Cities Service Oil Co. (278 App. Div. 164, affd. 303 N. Y. 823), and Rialto Luncheonette v. 1481 Broadway Corp. (supra) and other cases have been cited in support of Feinberg’s position. The first three of these cases deal with covenants containing general restrictions on businesses for “ similar purposes ” or “of the same or similar nature ”, rather than restrictions against specifically enumerated businesses as in our case, and the Rialto case deals with a restriction against a specifically enumerated business. Analysis of these cases will clearly reflect that they really do not sustain Feinberg’s contention and that courts, in interpreting restrictive covenants, look at the general nature of the allegedly competing businesses and consider what the dominant characteristics of the businesses are in determining whether the restrictive covenants are violated.
It is evident that there must be substantial overlapping before courts will enforce these covenants. Overlapping of a few items is not enough. Certainly, in this case, as already indicated, there is not merely a small amount of overlapping but a virtually similar menu, except as to soda fountain items.
Moreover, what the intention of the parties was and what they understood the restrictive covenant to mean can be further gleaned from the use clause in the Feinberg lease, which was consummated with the same landlord who then had knowledge of the covenant in the Liggett lease. The Feinberg lease primarily permitted the use of the premises ‘ for selling and dealing in books, lending library, greeting cards, stationery, toys, novelties, gift items, etc., and for no other purpose ”. And, parenthetically, for three years the store let to Feinberg was so used. As part of the clause (above quoted) contained in the Feinberg lease which limited the use of the store let to Feinberg, he was also given the right to ‘ maintain a bona fide restaurant in the said building, the primary object of which is the sale of food, and for such purpose to have a license and sell wines, beer and liquors in connection therewith ”. This clause clearly indicates the character of restaurant that it was intended Feinberg could operate. The proposed Burger Bowl is not such type of food establishment.
Furthermore, no reference was made in the Feinberg lease for use as a “ luncheonette ”. A “ restaurant ” differs greatly *536 from a “ luncheonette ”. (See Weiss v. Mayflower Doughnut Corp., 130 N. Y. S. 2d 264, affd. 285 App. Div. 1031, supra.)
If the landlord understood and thought that the words ‘ ‘ soda fountain-luncheonette ” in the restrictive covenant in the Liggett- lease did not preclude a luncheonette without a soda fountain, then it could have and would have provided for use of a “ luncheonette ” instead of a “bona fide restaurant” as described in the Feinberg lease.
It is therefore indeed reasonable to infer that the landlord knew that the words “ soda fountain-luncheonette ” contained in the Liggett lease were intended to preclude a luncheonette.
As indicated, Feinberg also contends that in any event his proposed establishment is a restaurant, not a luncheonette, and is therefore permissible under the terms of the restrictive covenant, even if the same is construed to prohibit a luncheonette.
The language above quoted from Weiss v. Mayflower Doughnut Corp. Csupra) draws the distinction between a restaurant and a luncheonette.
In essence, a restaurant is a place which serves, through waiters or waitresses, full meals or food specialties, totally or principally at tables, in comfortable surroundings, and where the food is not prepared, cooked and served from apparatus open and visible to the customer. In a restaurant service is intended to be leisurely, whereas in a luncheonette service is expedited so as to have a fast turnover of customers.
The character of construction and the nature of operation of the food establishment that Feinberg here details and proposes, is clearly not a restaurant but rather a luncheonette. Certainly, it is not the type of restaurant envisioned and permitted by the language, above recited, contained in his lease.
Restrictive covenants should be interpreted realistically to achieve the obvious purpose for which they were inserted in leases. Such realistic approach leads to the inescapable conclusion that a luncheonette of any character, including a Burger Bowl type, may not here be erected and operated.
Feinberg also refers to the afore-mentioned December, 1952, modification agreement between plaintiff and himself, which provides that ‘ ‘ the tenant shall have the right to assign Ibis lease or to sublet the premises herein demised or any part thereof or for any purpose other than for the purposes prohibited by paragraph 37 hereof ”, and to the fact that he sublet the space formerly occupied by the greeting card store to Burger Bowl Restaurant, Inc., a corporation. He argues that the modification agreement enlarged the use to which the premises could be put by a sublessee.
*537 The modification agreement and sublease are of no significance in this case. The language of the said agreement, quoted above, does not set forth too clearly the purposes for which a sublease may be made. However, it is obvious that Feinberg cannot give greater rights to a sublessee than he himself has under his own lease and thereby affect the restrictive covenant in the Liggett lease, particularly if the sublessee is, in effect, himself. His rights and those of Burger Bowl Restaurant, Inc., are clearly subordinate to the restrictive covenant in the Liggett lease.
Judgment is accordingly directed, declaring that the lease dated June 18, 1942, between plaintiff and Liggett, prohibits and precludes Feinberg from erecting and operating, directly or indirectly, a luncheonette or soda fountain business, including Burger Bowl, at 204-8 Broadway, New York, New York, during the term of the aforesaid Liggett lease; and the judgment may provide injunctive and restraining provisions against Feinberg to effectuate the foregoing. The court sees no need for the judgment to provide for any injunctive or restraining provisions as against the plaintiff.
This constitutes the decision of the court in accordance with section 440 of the Civil Practice Act.
Settle judgment accordingly.